UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 14bk24420 |
| Ramon Aguirre | ) | |
| Bertha Aguirre, | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Judge Timothy A. Barnes |
| | ) | |

TIMOTHY A. BARNES, Judge.

MEMORANDUM DECISION

This matter comes before the court on the Motion of Wheeler Financial, Inc. for Relief from the Automatic Stay [Dkt. No. 91] (the "Motion for Relief") filed by Wheeler Financial, Inc. ("Wheeler") and the Debtors' Motion Pursuant to 11 U.S.C. § 1127(e) to Modify Confirmed Chapter 11 Plan as to Class Two (Wheeler-Dealer, Ltd DBA Wheeler Financial Inc., DuPage County, Cook County and JPMorgan Chase Bank, N.A.) [Dkt. No. 99] (the "Motion to Modify Plan") filed by Ramon Aguirre and Bertha Aguirre (together, the "Debtors"). The Motion for Relief seeks relief from the automatic stay as to 1374 West Grand Avenue, Chicago, Illinois (the "Property") based on the Debtors' default of their obligation to pay Wheeler under their confirmed chapter 11 plan. The Motion to Modify Plan was filed after the Debtors' default under their plan and seeks to modify the plan in order to extend the deadline for payment to Wheeler. Both the Motion for Relief and the Motion to Modify Plan (collectively, the "Motions") have been fully briefed and the parties have appeared before this court for oral argument on December 15, 2015 and January 20, 2016 (the "Hearings").

For the reasons stated below, the Motion for Relief is granted and the Motion to Modify Plan is denied.

JURISDICTION

The federal district courts have "original and exclusive jurisdiction" of all cases under title 11 of the United States Code (the "Bankruptcy Code"). 28 U.S.C. § 1334(a). The federal district courts also have "original but not exclusive jurisdiction" of all civil proceedings arising under title 11 of the United States Code, or arising in or related to cases under title 11. 28 U.S.C. § 1334(b). District courts may, however, refer these cases to the bankruptcy judges for their districts. 28 U.S.C. § 157(a). In accordance with section 157(a), the District Court for the Northern District of Illinois has referred all of its bankruptcy cases to the Bankruptcy Court for the Northern District of Illinois. N.D. Ill. Internal Operating Procedure 15(a).

A bankruptcy judge to whom a case has been referred may enter final judgment on any core proceeding arising under the Bankruptcy Code or arising in a case under title 11. 28 U.S.C. § 157(b)(1). A motion for relief from stay arises in a case under title 11 and is specified as a core proceeding. 28 U.S.C. § 157(b)(2)(G); *In re Mahurkar Double Lumen Hemodialysis Catheter Patent Litig.*, 140 B.R. 969, 976-77 (N.D. Ill. 1992); *In re Quade*, 482 B.R. 217, 221 (Bankr. N.D. Ill. 2012)

1

(Barnes, J.). A motion to modify a confirmed plan may also only arise in a case under title 11 and is a core proceeding. 28 U.S.C. §§ 157(b)(2)(A), (L) and (O).

Accordingly, final judgment is within the scope of the court's authority.

## PROCEDURAL HISTORY

In considering the Motions, the court has considered the arguments of the parties at the Hearings, has reviewed and considered the Motions themselves, the attached exhibits submitted in conjunction therewith, and has reviewed and found each of the following of particular relevance:

1. Second Amended Plan of Reorganization [Dkt. No. 69] (the "Plan");

2. Order [Dkt. No. 84] (the "Modifying Order");

3. Order Approving Second Amended Disclosure Statement (Dkt. No. 70) and Confirming Second Amended Plan of Reorganization (Dkt. No. 69) [Dkt. No. 85] (the "Confirmation Order");

4. JPMorgan Chase Bank, N.A.'s Response to Motion of Wheeler Financial Inc., [sic] For Relief from the Automatic Stay [Dkt. No. 100];

5. Debtors' Response to Motion of Wheler [sic] Financial Inc.'s Motion for Relief from the Automatic Stay [Dkt. No. 101];

6. Objection of Wheeler Financial, Inc. to Debtors' Motion to Modify Confirmed Chapter 11 Plan [Dkt. No. 109];

7. JPMorgan Chase Bank, N.A.'s Reply to Objection of Wheeler Financial Inc., [sic] to Debtors' Motion to Modify Plan [Dkt. No. 112, duplicate filing at Dkt. No. 114];

8. Reply of Wheeler Financial, Inc., in Support of Its Motion for Relief from the Automatic Stay [Dkt. No. 113];

9. Debtors' Reply in Supprt [sic] of Their Motion to Modify Their Confirmed Chapter 11 Plan [Dkt. No. 115];

10. JPMorgan Chase Bank, N.A.'s Supplement in Support of Debtors' Motion to Modify Plan [Dkt. No. 119];

11. Joint Supplement by JPMorgan Chase Bank, N.A. and the Debtors to Their Responses to the Motion for Relief from the Automatic Stay by Wheeler Financial Inc. [Dkt. No. 120] (the "Joint Supplement"); and

12. Response of Wheeler Financial, Inc. to Supplement and Joint Supplement [Dkt. No. 131].

Though these items together do not constitute an exhaustive list of the filings in the above-captioned bankruptcy case, the court has taken judicial notice of the contents of the docket in this matter. *See Levine v. Egidi*, No. 93C188, 1993 WL 69146, at *2 (N.D. Ill. Mar. 8, 1993) (authorizing a bankruptcy court to take judicial notice of its own docket); *In re Brent*, 458 B.R. 444, 455 n.5 (Bankr. N.D. Ill. 1989) (Goldgar, J.) (recognizing same).

## BACKGROUND

In this matter, the facts are essentially undisputed. For the purposes of determining the Motions, the court therefore finds as follows:

The Debtors petitioned for bankruptcy protection under chapter 11 on June 30, 2014 (the "Petition Date"). The Debtors' schedules did not list a debt owed to a third party purchaser of tax claims. That was incorrect. The Debtors did, in fact, owe past due taxes on the Property that resulted in the purchase of that debt by a third party tax purchaser prior to the Petition Date.

More specifically, the Debtors owed 2010 real estate taxes on the Property totaling approximately $10,592.98. The Debtors also failed to pay the first and second installments of property taxes for tax years 2011 and 2012 and the first installment of tax year 2013. On August 8, 2012, Wheeler purchased the 2010 delinquent taxes at a tax sale and subsequently paid the 2011, 2012 and first installment of the 2013 taxes. The time period within which the Debtors could pay Wheeler before title to the Property transferred pursuant to applicable state law (more fully discussed *infra*), otherwise known as the redemption period, was scheduled to expire on September 8, 2014. On December 10, 2014, Wheeler filed a petition in the Circuit Court of Cook County to pursue its applicable rights with respect to the Property. Nonetheless, Wheeler subsequently extended the redemption period an additional six months to June 8, 2015 (the "Redemption Deadline").[1]

Because the Debtors did not list the obligation to Wheeler on their schedules and failed to provide notice to Wheeler of its bankruptcy case prior to the claims bar date, September 26, 2014, Wheeler did not file a proof of claim in this case. After the bar date had passed, the Debtors worked in earnest with JPMorgan Chase Bank, N.A. ("JPMorgan"), on a plan of reorganization. Court notes from hearings in November 2014 indicate that those efforts include addressing the Debtors' tax issues. While the original plan and disclosure statement proposed by the Debtors did not at that time include a treatment of Wheeler, by December 16, 2014, the Debtors had amended that plan and disclosure statement to include Wheeler. *See, e.g.*, Plan ¶ 3.2(A), p.10.

Nonetheless, it was not until March 1, 2015 that Wheeler learned of the Debtors' bankruptcy filing when it received a copy of the Debtors' proposed plan of reorganization. *See* Certificate of Service of Class 2 Ballots [Dkt. No. 75]. In the Plan, the Debtors estimated their liability to Wheeler as $40,000.00. Plan, ¶ 3.2(A), p.10.

---

[1] No party explains how an extension of an already expired redemption period is valid. Because no party challenges the validity of the extension and because the parties' subsequent actions clearly indicate a reliance of all concerned in the extension's effect, the court makes no determination regarding the validity of the extension but does, as discussed below, have concerns regarding it.

JPMorgan is the holder of a cross-collateralized claim secured by a restaurant on the Property located in the West Loop of Chicago near the United Center and a separate property located at 4599 Hatch Lane in DuPage County that serves as the Debtors' residence. *See* Claim 4-1. As set forth in the Plan, the secured debt owed to JPMorgan far exceeds the value of those two properties combined. Plan, Preamble, p. 2. Pursuant to the Plan, the Debtors are to make monthly payments of $8,000.00 to JPMorgan, Plan, ¶ 3.2(A), p. 7, and the Debtors have made these payments since October 2014. *See* Agreed Adequate Protection Order [Dkt. No. 52]. In comparison, since filing for bankruptcy protection, the Debtors have made no payments to Wheeler.

The Debtors' Plan was filed on February 10, 2015. The Plan was presented by the Debtors and solicited according to the procedures provided for in the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure. Though the Debtors had not notified Wheeler when they commenced the bankruptcy case or scheduled Wheeler's claim, the Debtors included Wheeler in the solicitation. As a result, the Debtors received feedback from Wheeler and, to resolve its potential objection, through the Modifying Order amended the terms of their Plan as it related to Wheeler. At the April 15, 2015 confirmation hearing, the Debtors presented the court with the Modifying Order and requested that it be entered along with the Confirmation Order.[2] The Modifying Order provides that the Debtors would "sell the property and/or payoff the entire balance owed to Wheeler-Dealer, Ltd. within six months of confirmation."[3] The Debtors' Plan proposed a sale of 1307 Burlington, Lisle, Illinois (the "Sale Property") to obtain funds to satisfy the debt owed to Wheeler and the Modifying Order set the deadline for payment to Wheeler within six months, which was October 15, 2015 (the "Deadline"). The Plan, as modified, was confirmed at the April 15, 2015 confirmation hearing, prior to the running of the extended Redemption Deadline.

The attempts to sell the Sale Property generated only one offer. The offer was so substantially below asking price that it was rejected, and the Sale Property was not sold. Rather than address this situation with Wheeler and the court, the Debtors allowed the Deadline to come and go without taking any action. As a result, the Debtors defaulted on the Plan and on November 19, 2015, Wheeler moved for relief from the automatic stay, citing the default as cause pursuant to section 362(d)(1) of the Bankruptcy Code.

In the Motion for Relief, Wheeler argues that if the court were to apply the Seventh Circuit's *Fernstrom* factors, the potential harm to Wheeler would far exceed any harm to the Debtors or the estate. *See In re Fernstrom Storage and Van Co.*, 938 F.2d 731 (7th Cir. 1991). Wheeler alleges that it is

---

[2] Both JPMorgan and the Debtors argue that the Modifying Order does not have the same gravity as the Chapter 11 Plan. This argument has no merit. It is the practice of this court to permit minute orders. These minute orders serve an important purpose: they expedite proceedings for parties that need an immediate order. The Debtors knew in advance of the hearing on confirmation of the Plan that Wheeler sought a payment deadline. Instead of filing a modified plan and undertaking all that goes along with such, the Debtors' counsel drafted a handwritten order amending the Plan and the Debtors requested that the second amended Plan, as modified by that order, be immediately confirmed. Counsel for the Debtors represented to the Court that the Modifying Order was not material and did not require a resolicitation of the Plan. Counsel for JPMorgan was present at this hearing and provided no objection to the Modifying Order. The Modifying Order therefore amended the Plan and the arguments to the contrary are specious.

[3] Wheeler-Dealer, Ltd., is apparently the legal name of Wheeler, which does business as Wheeler Financial, Inc. *See* Motion to Modify Plan.

4

prejudiced by the continued delay of payment and that it has a strong likelihood of prevailing on the merits of its tax deed outside of the bankruptcy court proceedings.

In response to the Motion for Relief, the Debtors first filed the Motion to Modify Plan, wherein they finally sought to address the default, and later filed a response. The Motion to Modify Plan, filed over a month after the passing of the Deadline, asserts that the Debtors need more time to sell the Sale Property and thus need more time to make the payment to Wheeler. The Debtors request that the Deadline be extended to April 15, 2016 (an additional six months) to pay Wheeler in full. After six months, if the Sale Property is still not sold, the Motion to Modify states that JPMorgan will step in and finally make the payment to Wheeler.

The Debtors rely on section 1127(e), which as discussed below allows a debtor to modify a confirmed chapter 11 plan. No explanation was offered as to why, and given the nature of the default, the Debtors did not and could not have sought modification prior to the default having occurred. The Debtors' thereafter filed a response to the Motion for Relief. In that, they argued that the Motion for Relief would be mooted by the Motion to Modify Plan and adopted JPMorgan's response, discussed below.

Throughout the course of these matters, JPMorgan has acted in concert with the Debtors, at times simply supporting the Debtors' positions, acting through the Debtors, or acting jointly with the Debtors. These acts have all been less than subtle advances of JPMorgan's own agenda. It has been very clear that JPMorgan is in charge, so much so that in hearings JPMorgan's counsel has more than once argued the Debtors' position before the Debtors did so. That comes as little surprise, given what is at stake. While the Debtors stand to lose their ownership in one of their various properties, if Wheeler is successful in enforcing its rights, JPMorgan stands to lose its priority security interest in the Property, valued at over $1,000,000.00. *See* Debtors' Schedule A.

It is also no surprise then that JPMorgan argued vociferously against the Motion for Relief, introducing arguments that the Debtors' briefings did not supply. Among the various theories advanced by JPMorgan, JPMorgan argues that Wheeler no longer had a security interest in the Property and therefore had no standing to bring the Motion for Relief. This is because, JPMorgan alleges, the Plan reduces Wheeler's claim to an impaired unsecured claim of $40,000.00 and Wheeler failed to file a proof of claim. Alternatively, JPMorgan argues that even if Wheeler does have a security interest, the Debtors may, pursuant to the plain language of section 1127(e), modify the Plan's treatment of that interest.

In discussing the *Fernstrom* factors, JPMorgan argues that the hardship that would result for the Debtors would outweigh any harm to Wheeler. JPMorgan alleges that Wheeler would make an inequitable profit if permitted to enforce its rights on the Property, while the Debtors would "lose everything" including the business operated on the Property and the Debtor's residence on which JPMorgan's lien is cross-collateralized. Neither JPMorgan nor the Debtors explain how Wheeler enforcing its rights against the Property will equate to the Debtors losing either the Property, the business or their home, given the uncertainty of all parties' rights at the state court level. This is particularly hard to understand given that the threat of losing the residence that JPMorgan seeks to protect the Debtors from is a threat from JPMorgan itself. JPMorgan also does not explain how allowing a party its legally afforded rights amounts to an inequitable profit, or what exactly an inequitable profit might be.

5

After the January 20, 2016 Hearing, the court took the matter under advisement, promising a written ruling before March 23, 2016 or to take the bench that day and rule orally. However, after the Hearing Date but before March 23, 2016, JPMorgan chose to file two supplements without leave of court. The first supplement, dated January 26, 2016 [Dkt. No. 119], asserted that JPMorgan was in possession of $50,000.00 made payable to Wheeler Financial, Inc. This memorialized an oral representation made at the January 20, 2016 Hearing. The second supplement, the Joint Supplement, was filed on March 17, 2016 by JPMorgan (although the title provides it was filed jointly with the Debtors)[Dkt. No. 120], again without leave of court and just six days prior to the court's scheduled ruling date, and articulated entirely new arguments and legal theories. The Joint Supplement argued that the sale of the tax debt to Wheeler was actually a fraudulent transfer pursuant to the Seventh Circuit's decision in *Smith v. Sipi, LLC (In re Smith)*, 811 F.3d 228 (7th Cir. 2016). Not surprisingly, Wheeler thereafter sought leave to respond to both supplements [Dkt. No. 121]. Leave was granted, though the order granting leave reserved on whether the inappropriately filed supplements would be considered.

In response to the reservation in the court's order granting leave to Wheeler to respond, on March 23, 2016, JPMorgan filed a motion to have the supplements considered. Though in the absence of opposition that relief was ultimately granted on April 5, 2016 at the hearing on the request, the court was compelled to admonish JPMorgan's counsel for its behavior. JPMorgan, in filing the supplements without leave after the ordered briefing and after the court had taken the matter under advisement, violated well established rules of conduct in the court. Mistakes happen, and that might have been it. That was not, however, the crux of JPMorgan's argument to the court.

In its eventual motion to have the supplements considered, JPMorgan's counsel went one step beyond presuming to speak for the Debtors, this time presuming to speak for the court. By attempting to dictate a result to the court based on her "more than 25 years" of experience, counsel overstepped. When questioned, counsel could not articulate a single instance where a judge of this court had considered without leave supplemental filings after ordered briefing and after the court had taken the matter under advisement. Nor could she, as based on the survey the undersigned took of his colleagues, no sitting judge has ever done so. Finally, it should be noted that irony of this situation is not lost on the court. JPMorgan, in seeking to fix after the fact what it should have addressed earlier, continues an ill-advised course of conduct all too familiar in this matter.

## DISCUSSION

The matter before the court involves two separate, but intertwined requests – Wheeler's Motion for Relief and the Debtors' Motion to Modify Plan. The resolutions of these two motions are inextricably linked.

At issue is the Debtors' default under the Plan by failing to provide payment to Wheeler by the Plan Deadline. That Deadline was self-imposed and arbitrary. Prior to the amendment, the applicable provision (¶ 3.2(a) of the Plan) made the sale of the Sale Property a prerequisite to payment. At the confirmation hearing, however, the Debtors amended the Plan through the Modifying Order, and it was the Plan as so amended that was confirmed. The Modifying Order provided that "Debtors are to sell the property *and/or* pay off the entire balance owed to Wheeler-Dealer, Ltd. within six months of confirmation." Modifying Order (emphasis added). The Modifying Order was drafted by the Debtors' counsel and agreed to in open court. Had the Plan not been modified, the failure to sell the Sale Property would have prevented there from being a

payment default. Thus while careful drafting might have rescued the Debtors from this default, the Plan was not carefully drafted, and no provisions regarding defaults were addressed in the Plan. The Debtors are the victims of their own actions, twice over.

Wheeler seeks relief from the automatic stay citing the default as cause. In belated response, the Debtors seek to immediately amend the Plan to extend the time to repay Wheeler, which, the Debtors argue, will moot the Motion for Relief.

Even more tardily, JPMorgan now states that it is in possession of funds to satisfy Wheeler's claim under the Plan, first proposing to pay those funds to Wheeler only if an extended period to generate funds by selling the Sale Property is unsuccessful, and then, only when it appeared that Wheeler's Motion for Relief was under strong consideration, proposing to pay Wheeler immediately. This proposal has fewer feasibility concerns than the original, but it comes belatedly and begrudgingly, and may simply be too little, too late.

With this in mind, the court will review each of the Motions in turn.

A.    The Motion for Relief

The Debtors' Plan required the Debtors to sell the Sale Property and pay $40,000.00 of the proceeds to Wheeler, with the balance of the sale up to $50,000.00 to be paid to JPMorgan. Plan, ¶ 3.2(A), pp. 7-10. As originally drafted, the Plan made the sale of the Sale Property a precondition to Wheeler's payment. The Plan, as amended by the Modifying Order, however, required the Debtors to make the $40,000.00 payment to Wheeler by the Deadline of October 15, 2015 (six months from the confirmation date). The Debtors failed to sell the Sale Property but allowed the Deadline to come and go without taking any action. The Plan provided no contingency in the case of default.

There is no question therefore that when the Debtors failed to pay Wheeler by October 15, 2015, as required by the Plan, they committed a postconfirmation default under the Plan.

The law is clear that a postconfirmation default is cause to lift the automatic stay. *See, e.g., In re Randall*, 98 B.R. 916, 918 (Bankr. N.D. Ill. 1989) (Squires, J.); *see also Americredit Fin. Servs. v. Nichols (In re Nichols)*, 440 F.3d 850, 856 (6th Cir. 2006) ("A majority of courts that have construed the 'for cause' provision of section 362(d)(1) have found that a debtor's failure to make payments to the creditor after confirmation of the plan can constitute cause to modify or lift an automatic stay"); *OneWest Bank FSB v. Arizmendi (In re Arizmendi)*, Case No. BR 09-19263-PB13, 2011 WL 2182364, at *8 (Bankr. S.D. Cal. May 26, 2011) ("Here, there is a default under the Plan; and, thus, the mandates of Congress are clear the Court shall grant relief from stay."); *Bryant v. Tidewater Fin. Co. (In re Bryant)*, 430 B.R. 516 (Bankr. C.D. Ill. 2010) (granting relief from stay when the debtor defaulted postconfirmation in her maintenance payments under the plan); *In re Davis*, 64 B.R. 358, 359 (Bankr. S.D.N.Y. 1986) ("the debtors' failure to make post-confirmation payments will also constitute cause for lifting the stay"); *In re Quinlan*, 12 B.R. 516, 517 (Bankr. W.D. Wis. 1981) (finding that a debtor's "unexcused failure" to make direct payments to a creditor in accordance with confirmed chapter 13 plan constituted cause to grant relief from stay). The Debtors' postconfirmation default for failing to pay Wheeler by the Deadline therefore is cause to lift the automatic stay, and neither JPMorgan nor the Debtors dispute that, nor could they.

7

JPMorgan argues that Wheeler does not have standing to move for relief from the automatic stay because its lien was extinguished by the terms of the confirmed Plan. This argument is not well taken. Section 362(d) allows "a party in interest" to move for relief from the automatic stay. 11 U.S.C. § 362(d). Nothing therein requires the movant to have a lien or other security rights. Any party in interest can move for relief, and standing is not a matter that, if it appears to exist, should require further inquiry in a summary proceeding. *In re Vitreous Steel Prods. Co.*, 911 F.2d 1223, 1232 (7th Cir. 1990) (finding that motions for relief from the automatic stay are summary in nature and therefore the issues considered are "limited strictly to adequacy of protection, equity, and necessity to an effective reorganization"); *see also In re Jepson*, No. 14-2459, 2016 WL 1105311 (7th Cir. Mar. 22, 2016) (affirming the bankruptcy court's denial of a standing challenge brought in defense to a motion for relief from stay). In this case, Wheeler is a party in interest to the bankruptcy proceedings, and has standing to seek relief from stay.

In the Joint Supplement, the Debtors and JPMorgan again challenge Wheeler's standing, although use a new strategy by arguing that Wheeler's standing as a party in interest is the result of a fraudulent transfer. *See Smith*, 811 F.3d at 228. *Smith* does not, however, change the outcome of the instant matters. *Smith* dealt with the avoidance of a tax deed as a fraudulent transfer. *Id.* JPMorgan and the Debtors argue that because *Smith* permits debtors to avoid tax deeds as constructively fraudulent transfers, granting Wheeler stay relief amounts to a "court-sanctioned fraudulent transfer." Joint Supplement, p. 3.

This argument is not relevant to the disposition of these matters. First, the relief sought is procedurally improper. To avoid a transfer of a lien, the proper procedure is to initiate an adversary proceeding. *See generally* Fed. R. Bankr. P. 7001. Second, Wheeler's claim has not matured into a tax deed yet. This is a factual distinction from *Smith*, where the tax purchaser obtained the tax deed within the two years prior to the bankruptcy filing. *Smith*, 811 F.3d at 235 ("This was the rare case, however, in which no one redeemed the property."). After the purchaser in *Smith* obtained its tax deed, it sold the property for a profit. Third and most important, the Debtors' Plan fails to provide for a reservation of causes of action. *See P.A. Bergner & Co. v. Bank One, N.A. (In re P.A. Bergner & Co.)*, 140 F.3d 1111, 1117 (7th Cir. 1998) ("Under the Bankruptcy Code, the debtor must specifically identify in its reorganization plan the claims it wishes to pursue postconfirmation"); *see also D&K Props. Crystal Lake v. Mutual Life Ins. Co.*, 112 F.3d 257, 261 (7th Cir. 1997) (the plan "failed to identify any claim it was reserving and its cause of action thus is barred."). As a result, any claim for a fraudulent transfer regarding Wheeler has been barred by the confirmation of the Plan without reserving that action. This argument is not, therefore, well taken.

The analysis for stay relief does not, however, end there. Though Wheeler has standing to request modification of the automatic stay, the grounds for such relief – "cause" as alleged by Wheeler – under *Fernstrom* must be addressed. In *Fernstrom*, the Seventh Circuit cited three factors that a court should weigh in determining cause "when equitable considerations weigh heavily in favor of the creditor and the debtor bears some responsibility for creating the problems." 938 F.2d at 735 (*quoting Matthews v. Rosene*, 739 F.2d 249, 251 (7th Cir. 1984)). These factors are:

a) Any great prejudice to either the bankrupt estate or the debtor will result from continuation of the [action the creditor is seeking relief to pursue],

8

b) The hardship to the [non-bankrupt party] by maintenance of the stay considerably outweighs the hardship of the debtor, and

c) The creditor has a probability of prevailing on the merits.

*Id. (citing In re Pro Football Weekly*, 60 B.R. 824, 826 (N.D. Ill. 1986)). The equities in this case are, as the foregoing background provides, integral to stay relief analysis because the Debtors do bear sole responsibility in creating the problem the court is presently faced with. It is their inaction with respect to payment of Wheeler under the Plan, or predefault modification of the Plan, that puts the parties in the position they are now in.

As discussed *supra*, Wheeler may have a probability of prevailing on the merits in state court. But any determination of Wheeler's merits in that forum would be advisory and, therefore, the court will not make such a determination.[4] That the state court is better suited to sort out these issues, however, is undeniable.

In this case, therefore, analysis under *Fernstrom* boils down to a weighing of the first and second factors. If the stay is modified and Wheeler is allowed to petition for a tax deed, a great prejudice will result to both the Debtors and JPMorgan. The Debtors will lose the Property, which generates the income the Debtors use to fund the Plan, which in turn, pays JPMorgan. Wheeler, however, will also face a hardship if the stay is maintained and the court grants the Debtors more time to pay Wheeler's claim. Though the hardship to Wheeler may appear to be only the passage of time, this payment deadline was the only protection afforded Wheeler when it was brought into the case at the eleventh hour. It is unclear what rights Wheeler might have been afforded had it been afforded more fulsome due process in the case. What is clear is that the one and only protection afforded Wheeler, a secured creditor, is at risk.

Wheeler has been patient in providing the Debtors well beyond the original redemption period allowed under Illinois law, participating with the Plan and giving the Debtors space to reorganize. During this same period, in which Wheeler has received nothing but promises, JPMorgan, the other secured creditor in the case, has received $8,000.00 a month in adequate protection payments. Since October 2014, when those payments commenced, JPMorgan has collected an estimated $144,000.00, all during the pendency of this case. While these payments are made, the Debtors and JPMorgan would have the court believe that there have been no funds to pay Wheeler absent a sale of the Sale Property.

These tactics, including the very belated and begrudging offers of JPMorgan have not gone unnoticed by the court. Perhaps the simplest description of these events is the age-old adage: "pigs get fat, but hogs get slaughtered." *Fin. Inv. Co. (Bermuda) v. Geberit AG*, 165 F.3d 526, 534 (7th Cir. 1998).

---

[4] This court has no jurisdiction to issue advisory opinions. *In re FedPak Sys., Inc.*, 80 F.3d 207, 211-12 (7th Cir. 1996) ("A bankruptcy court, like any other federal court, lacks the constitutional power to render advisory opinions or to decide 'abstract, academic, or hypothetical questions.'") (*quoting 1819, Ltd. v. Florida Dep't of Revenue. (In re Inn on the Bay, Ltd.)*, 154 B.R. 364, 367 (Bankr. S.D. Fla. 1993)).

The list of inappropriate actions toward Wheeler and the bankruptcy process in general in this case is much longer than should be countenanced by any court. The Debtors and JPMorgan have wasted repeated chances to pay Wheeler and remove the threat of Wheeler's tax deed foreclosing all other interests in the Property, and appear to only act appropriately when forced to do so. Despite the potential harm to the Debtors and JPMorgan, the equities favor Wheeler.

As the forgoing makes clear, in a vacuum, the Motion for Relief should, therefore be granted. The Motion for Relief no longer exists in a vacuum, however. The Debtors have filed a Motion to Modify Plan, and the Motion for Relief must be considered in light of that.

B.     The Motion to Modify Plan

In the Motion to Modify Plan, the Debtors seek until April 15, 2016 to sell the Sale Property and pay Wheeler. If the Sale Property is still not sold after the six months, JPMorgan will make the payment to Wheeler, nonetheless. Further, as noted above, JPMorgan proposed an alternative in court, offering to pay Wheeler immediately.

1.     *11 U.S.C. § 1127*

Section 1127 of the Bankruptcy Code provides the means to modify a confirmed plan. If the debtor is an individual, a confirmed plan may be modified at any time before completion of payments under the plan, whether or not the plan has been substantially consummated, upon request of the debtor. 11 U.S.C. § 1127(e); *see also* 7 *Collier on Bankruptcy*, ¶ 1127.04 (16th ed. 2012). The reason section 1127(e) may be invoked by the Debtors, is that the Debtors, individual persons, have not completed Plan payments to at least one creditor, Wheeler.

Section 1127(e)(1) specifically permits a modification to extend or reduce the time for making payments under the plan, provided, however, that the proposed modification cannot cause the plan to cease compliance with sections 1121 through 1129.[5] 11 U.S.C. §§ 1127(e)(1) and (f).

---

[5]     Wheeler argues that, by requiring compliance with section 1129, section 1127(f)(1) requires the Debtors to undergo a brand new confirmation hearing when proposing a modification. *See* Objection of Wheeler Financial, Inc. to Debtors' Motion to Modify Confirmed Chapter 11 Plan, pp. 4-8. Wheeler provides no case citation or legislative support for this reading of section 1127(f)(1). If true, however, Wheeler argues that the Debtors may not modify the Plan as to Wheeler as the Redemption Dates has passed, and no plan may be confirmed reviving rights that are extinguished.

While the practical effects of imposing compliance with section 1129 have not been discussed in detail by courts, the statute is unambiguous. Section 1127(f)(1) reads: "Sections 1121 through 1128 and the requirements of section 1129 apply to any *modification* under subsection (e)." 11 U.S.C. § 1127(f)(1) (emphasis added). The language emphasized in the statute clearly only applies the requirements of section 1129 to the modification, not anew to the Plan as modified.

The Supreme Court has stated that "[t]he task of resolving [a] dispute over the meaning of [a statute] begins where all such inquiries must begin: with the language of the statute itself." *United States v. Ron Pair Enter., Inc.*, 489 U.S. 235, 241 (1989); *In re Randle*, 358 B.R. 360, 362 (Bankr. N.D. Ill. 2006) (Doyle, J.), *aff'd*, Case No. 07C631, 2007 WL 2668727 (N.D. Ill. July 20, 2007). Where the language of the statute is unambiguous, no further inquiry is necessary or appropriate. *Sebelius v. Cloer*, 133 S. Ct. 1886, 1895 (2013). Had Congress intended for a new confirmation hearing on the entire plan, revisiting issues that were

The statute therefore permits the Debtors to attempt a modification. That permission, however, does not mean that all proposed modifications will be accepted, even if they comply with section 1127(f).

To have their proposed modification accepted, the Debtors must show that the modification is feasible. *In re Repurchase Corp.*, 332 B.R. 336, 342 (Bankr. N.D. Ill. 2005) (Schmetterer, J.), aff'd, Case No. 05 C 7075, 2008 WL 4379035 (N.D. Ill. Mar. 24, 2008) (a chapter 11 plan proponent has the burden of proving that a plan complies with the statutory requirements by a preponderance of the evidence). In arguing feasibility, the plan's proponent need not establish that the plan carries a guarantee of success. *In re 203 N. LaSalle St. P'ship*, 126 F.3d 955, 962 (7th Cir. 1997), aff'd, *Bank of Am., Illinois v. 203 N. LaSalle St. P'ship*, 195 B.R. 692 (N.D. Ill. 1996), aff'd, *In re 203 N. LaSalle St. P'ship*, 126 F.3d 955 (7th Cir. 1997), rev'd on other grounds, *Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434 (1999) (finding that a debtor's "hope for funding was neither corroborated nor credible" and thus denied confirmation). Instead, the proponent must show that the plan provides for a "reasonable assurance" of viability. *Id.*

The court, in considering the proposed modification, must take into account a number of factions: is the modification so material as to require resolicitation?; does the modification cause the plan to no longer be fair and equitable?; does the modification and the circumstances under which it is sought comport with overriding bankruptcy concerns, *e.g.* is the debtor honest but unfortunate?

Without, for the moment, considering JPMorgan's offer to pay Wheeler directly and immediately, it is clear that the Debtors themselves cannot demonstrate the feasibility of the modification with reasonable assurance of viability. Since confirmation almost a year ago, only one offer for purchase of the Sale Property has been received and it was so low that it was rejected. The Debtors' Motion to Modify Plan fails to describe any marketing efforts, past or future, including the list price or the use of a real estate broker, of the Sale Property. This does not show potential feasibility of the modification, just an additional delay at Wheeler's expense. Because the modification is infeasible on its face, this court need not determine if the modification complies with the remainder of section 1127(f).

The Debtors have already been afforded six months to complete the payments to Wheeler, in addition to the almost five years the Debtors have had to pay this tax claim otherwise. The Plan set a performance date of October 15, 2015. The Debtors did not comply with the terms of the Plan. Further, the Debtors had every opportunity to propose a modification prior to the default and only brought the Motion to Modify Plan in response to Wheeler's Motion for Relief, after their own default.

Under the circumstances, the court cannot conclude that the modification, as originally proposed in the Motion to Modify Plan, is either feasible or equitable. The court recognizes that in permitting Wheeler to exercise its state law rights, whatever those rights may be, the result might be

---

considered at the prior confirmation hearing, then Congress could have chosen a different phrase, *e.g.*, "apply to any modified plan" or "apply to the modification and the plan."

Wheeler's position is at odds with bankruptcy practice and would create a circumstance where a plan would become a moving target; a final confirmation would become impossible. For these reasons, and because this theory does not govern the outcome of the matter, Wheeler's assertion is rejected.

11

considered by some to be a "windfall" to Wheeler. If that is the case, it is the result of a system created by the state law and the actions of the Debtors and JPMorgan. It is not appropriate for this court to protect the Debtors and JPMorgan from the consequences of state law and their own actions, while further denying Wheeler its rights.

    2.    *Wheeler's Postconfirmation Rights*

The offer of immediate payment by JPMorgan complicates the analysis, as does the nebulous status of Wheeler's rights at this time. While the court is not inclined to enforce the former given the last minute nature of the offer and the overall inequitable conduct of the Debtors and JPMorgan,[6] it may be that Wheeler has only limited state law rights available to it, and it may also be that Wheeler may want to avail itself of the offer for payment from JPMorgan given possible limited state rights. To fully understand that, let's consider for a moment Wheeler's postconfirmation rights.

Under Illinois law, if a property owner fails to pay taxes, the county obtains a lien on the property on January 1 of the year immediately following the year in which the taxes are due. 35 ILCS 200/21-75; *see also In re Bovino*, 496 B.R. 492, 503 (Bankr. N.D. Ill. 2013) (Barnes, J.); *In re Commings*, 297 B.R. 701, 704 (Bankr. N.D. Ill. 2003) (Goldgar, J.) ("On January 1 of each year, an *in rem* lien securing payment of property taxes levied in that year attaches to real property in Illinois"). With the exception of some federal obligations, that lien has priority over all other liens. 35 ILCS 200/21-75; *Commings*, 297 B.R. at 704. If the property owner pays the taxes, the lien will be extinguished. *Id.* If it does not, the county has the choice to recover the taxes through different types of tax sales. *In re McKeever*, 132 B.R. 996, 1006 (Bankr. N.D. Ill. 1991) (discussing the basic five types of tax sales). When the taxes are sold, the county's lien shifts to the tax purchaser, and a statutory redemption period is created. *Commings*, 297 B.R. at 704 (*citing* IICLE, Real Estate Taxation § 5.29 at 5-28 (1997)). This transfer does not transfer legal or equitable title to the property to the tax purchaser. Instead, the purchase of the taxes by a third party transfers the county's lien, "including the right to proceed to tax deed and obtain legal title if no valid redemption is made." *McKeever*, 132 B.R. at 1006.

Such a tax lien may still be satisfied or extinguished in accordance with state law. At issue in this case is the satisfaction of a tax lien by redemption by the owner or an interested party before the expiration of the relevant redemption period. Illinois Const., Art. IX, § 8 (creating the right of redemption for sale of real estate for the nonpayment of taxes). Although tax laws are generally construed in favor of the tax payer, *People ex. Rel. Hempen v. Baltimore & O.R. Co.*, 379, Ill. 543, 549 (IL 1942), "redemption is a statutory privilege and must be exercised in substantial compliance with the statute." *United Legal Found. v. Dep't of Revenue*, 272 Ill. App.3d 666, 676 (1st Dist. 1995). This period allows the debtor, a mortgage holder, or another party in interest to redeem the taxes by paying the delinquent amount plus any compounded interest. 35 ILCS 200/21-345. According to the Illinois Property Tax Code, property can be redeemed from such a tax sale "at any time before the expiration of 2 years from the date of sale" unless extended by the tax purchaser, in which case the property "may be redeemed on or before the extended redemption date." 35 ILCS 200/21-350.

---

[6]    Among the facts not lost on the court is the fact, as mentioned earlier, that JPMorgan has been receiving regular funds from the Debtors in real time while Wheeler has been held in abeyance.

Applicable Illinois state law clearly sets out the necessary mode, manner, and time for payment. 35 ILCS 200/21-355 (To redeem property, the redemption amount must be deposited with the applicable county clerk "prior to the close of business . . . on or before the expiration of the period of redemption . . ."). Any redemption attempted after the expiration of the period specified in the statute or after an extension period is a "nullity and of no legal effect." *In re Application of Cnty Collector*, 99 Ill.App.2d 143, 146 (3d Dist. 1968). This is true even if a tax deed has not yet been issued. *People v. Altman*, 9 Ill.2d 277 (IL 1956).

Once the tax redemption period expires, the purchaser does not automatically obtain a tax deed on the property. *Commings*, 297 B.R. at 704. Within three to six months prior to the expiration of the redemption period, the purchaser must petition the state court for a tax deed and send notice of the petition to the property owner. 35 ILCS 200/22-30; 35 ILCS 200/22-5. When obtained and recorded, a tax deed eliminates other security interests because the title to the property will be passed on to a tax purchaser "free and clear of all previous title and claims of every kind and character." *McKeever*, 132 B.R. at 1007. The tax purchaser must obtain the deed and record it within one year after the redemption period expires, or the deed, the certificate and the sale itself are deemed void. 35 ILCS 200/22-85.

Those rights, must however be viewed through the lens of the confirmed Plan. "'The provisions of a confirmed plan bind the debtor and each creditor whether or not the claim of such creditor is provided for by the plan, and whether or not such creditor has objected to, has accepted, or has rejected the plan.'" *In re Stovall*, 256 B.R. 490, 493 (Bankr. N.D. Ill. 1999) (Schmetterer, J.) (*quoting In re Duke*, 153 B.R. 913, 915-916 (Bankr. N.D. Ala. 1993)). Confirmed plans thus have a "preclusive effect." *Siemens Energy & Automation, Inc. v. Good (In re Heartland Steel, Inc.)*, 389 F.3d 741, 744 (7th Cir. 2004). As a result of confirmation, a plan replaces a debtor's prepetition obligations to creditors with the obligations to those creditors set forth in the confirmed plan. Thus, after confirmation, "a creditor's lien rights are only those granted in the confirmed plan." *In re American Properties, Inc.*, 30 B.R. 239, 246 (Bankr. D. Kan. 1983).

The terms of a plan itself can expressly preserve or abrogate liens. *Stovall*, 256 B.R. at 493 ("[L]iens only survive bankruptcy where the debt is provided for in the plan and is paid in full."); *see also In re Penrod*, 50 F.3d 459, 462, 4633 (7th Cir. 1995) (finding that "liens pass through bankruptcy unaffected ... *unless* they are brought into the bankruptcy proceeding and dealt with there.") (emphasis added). Under some circumstances, a reorganization plan's silence regarding a creditor's continuing secured interest in the debtor's property can eliminate a creditor's lien. *Airadigm Communs., Inc. v. FCC (In re Airadigm Communs., Inc.)*, 519 F.3d 640, 647 (7th Cir. 2008).

Courts apply contract principles to interpret a confirmed plan. *See N. Shore Gas Co. v. Salomon Inc.*, 152 F.3d 642, 652 (7th Cir. 1998). The Plan must, therefore, be interpreted under Illinois contract law. In this case, the language of the Plan did not expressly extinguish Wheeler's rights as a tax purchaser against the Property, which is a lien that includes both the right to payment and a right to an equitable remedy against the Debtors' property. *In re LaMont*, 740 F.3d 397, 408-409 (7th Cir. 2014). The Plan predicated extinguishing Wheeler's rights in its collateral on "the completion of the payments required under this Plan to the holders of Allowed Claims, [that] such Claims [or] any liens that may support such Claims shall be deemed released and discharged." Plan, ¶ 4.4, p. 11. The Plan makes this point again in paragraph 9.1: "[t]he distributions provided under

13

the Plan shall be *in exchange for* and in complete satisfaction and *release of all Claims* against any of the assets or properties of the Debtors." Plan, ¶ 9.1, p. 13 (emphasis added).[7]

No payments or distributions have been made to Wheeler that would trigger the release or discharge contained paragraphs 4.4 or 9.1 of the Plan. Therefore, pursuant to the terms of this Plan, because the Debtors have not yet triggered the release provisions of paragraphs 4.4 or 9.1, Wheeler's claim, both the right to payment and the right to an equitable remedy, survives. *See LaMont*, 740 F.3d at 408-409.

To this court's knowledge, treating a delinquent tax claim through the modification of a confirmed plan has not been dealt with in the context of an expired redemption period. In Chapter 13 and 11 cases, this court has previously determined that a debtor is allowed to spread the payments for a tax claim over the life of a plan if the plan is confirmed prior to the expiration of the redemption deadline. *See, e.g., Bovino*, 496 B.R. at 503; *see also In re Romious*, 487 B.R. 883 (Bankr. N.D. Ill. 2013) (Baer, J.). These cases reason that prior to the expiration of the redemption deadline, a debtor still owns the property because title has not yet passed. *Zajicek v. Burks*, Case Nos. 13 C 50339 and 14 C 50044, 2014 WL 1612277, at *1 (N.D. Ill. Apr. 22, 2014). Thus, if a bankruptcy petition is filed before the redemption period expires, in addition to its lien, the tax purchaser merely has "a right to payment or alternatively, a right to an equitable remedy against the debtors' property" while the delinquent taxpayer retains title to the subject property. *LaMont*, 740 F.3d at 409, 406; *see also In re Tynan*, 773 F.2d 177, 179 (7th Cir. 1985); *In re Bates*, 270 B.R. 455, 463 (Bankr. N.D. Ill. 2001) (Wedoff, J.) (finding that before the redemption expires the tax purchaser has a right to payment, while the debtors still owns the property). The property is, therefore, part of the bankruptcy estate and is treatable by a plan of reorganization. *Id.* As a result, if the redemption period had not expired, a debtor may propose a bankruptcy plan that pays tax purchasers over the life of the plan in the same matter other secured creditors are paid. *LaMont*, 740 F.3d at 397, 409-10; *Bovino*, 496 B.R at 504 (applying section 1123(b)(5)).

While the filing of a bankruptcy petition may act to extend or toll the redemption period in a limited fashion, *see* 11. U.S.C. § 108(b), the confirmation of the plan itself does nothing to change the timing of the redemption period. *See Multnomah Cnty. v. Rudolph (In re Rudolph)*, 166 B.R. 440, 444 (D. Or. 1994) (only section 108(b), and not section 1322(b), can extend a redemption period); *see also Krawczyk v. United States (In re Krawczyk)*, 201 B.R. 589, 591 (Bankr. N.D. Ga. 1996) (concluding that section 1322(c) could not extend the statutory redemption period after the tax sale occurred). As this court has previously stated, there is no principled reason to read virtually identical language differently simply because it is applied in different bankruptcy chapters. *Bovino*, 496 B.R. at 504 (finding the ability to treat redemption rights in a chapter 11 analogous to that in a chapter 13). The Plan does not, therefore, change the redemption period. *Lamont*, 740 F.3d. at 409 ("[t]he plan is *treating* his secured claim, *not formally redeeming* the property.") (emphasis added).

The redemption period, therefore, continues to run through the bankruptcy and may even expire during the bankruptcy. *Bates*, 270 B.R. at 467. As a result, this court routinely holds that

---

[7] The Debtors define "Claim" as having the same meaning set forth in section 101(5) of the Bankruptcy Code. Plan, ¶ 1.8, p. 4. Section 101(5) defines a claim as a right to payment or a right to an *equitable* remedy. 11 U.S.C. § 101(5) (emphasis added). Therefore, Wheeler's claim when the Plan was confirmed consisted of its right to payment and its equitable rights against the Property.

14

"[a]fter the redemption period has ended, there is no property tax claim that can be treated in bankruptcy." *Id.* at 461 (holding that the automatic stay "serves no substantial purpose" after the redemption period expires because there is no tax claim that can be treated in the bankruptcy).

In this case, the Debtors filed bankruptcy before the redemption period expired. The Debtors were able to and did propose an alternative treatment for the payment of Wheeler under the Plan. The Plan appears to have been confirmed before the redemption period expired. But that isn't clear-cut, given that the extension of that time period agreed to by Wheeler that would make confirmation timely was agreed to after the running of the period. How an expired period can be extended has not been argued before the court. Nonetheless, even assuming confirmation was timely, the Debtors failed to comply with the terms of the Plan. The Redemption Deadline has passed and the Debtors no longer have the ability to redeem the Property pursuant to state law. Certainly, they could not confirm a new plan at this stage, reviving those rights. *Bates*, 270 B.R. at 461. It is also unclear what effect, if any, the three to six month period for obtaining a tax deed will have on the Debtors' rights.[8] The language of the Plan required payment by the Debtors in *"exchange for ... release"* of Wheeler's claim. Plan, ¶ 9.1, p. 13 (emphasis added). Because the payment has not been made, Wheeler's claim, which includes its lien rights, has not been released. What value Wheeler's claim has under state law will be for the state court to determine.

It is unclear to the court, based on what has been presented, what the current status of either Wheeler's or the Debtors' rights under state law are with respect to the Property. What is clear is that Wheeler should not be prohibited from finding out, if that is its desire. Wheeler has established grounds for relief from the automatic stay and the last minute attempts of the Debtors and JPMorgan to circumvent Wheeler's rights are simply not compelling under the circumstances. Should Wheeler agree to stay in the Plan, the court will entertain a modification proposal agreed to by all. Otherwise, the parties' rights with respect to the Property is now a matter for the state court to determine.

It is within this court's discretion to deny a proposed modification to a confirmed plan. 11 U.S.C. § 1127(b) (phrased permissively) ("The proponent of a plan or the reorganized debtor *may* modify such plan ... if circumstances warrant such modification and the court, after notice and a hearing, confirms such plan as modified, under section 1129 of this title") (emphasis added). When faced with a party who has established its rights for relief from the automatic stay and a situation where there is a tenuous offer for payment like the one from JPMorgan, this court finds that it is too little, too late – the circumstances do not warrant modification. JPMorgan and the Debtors should not be rewarded for the benefits they have taken at Wheeler's expense.

---

[8] As noted above, Wheeler did at one point begin the process of seeking a tax deed, but did not apparently follow through and subsequently purported to extend the already expired redemption period. It remains an open question of state law whether a new request must be made by Wheeler, or if it is, whether the Debtors will be afforded the customary 3 to 6 months to respond.

CONCLUSION

For all of the foregoing reasons, the court concludes that, in the limited respect discussed herein, the Motion for Relief is well taken, and is, therefore, granted. The Debtors' Motion to Modify Plan is denied. Separate orders will be issued, concurrent with this Memorandum Decision.

Dated: April 18, 2016

_____
Timothy A. Barnes
United States Bankruptcy Judge